# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JESSICA GROVES, | : | Case No. 3:23-cv-160 |
| | : | |
| Petitioner, | : | |
| | : | |
| vs. | : | Judge Thomas M. Rose |
| | : | Magistrate Judge Elizabeth P. Deavers |
| WARDEN, DAYTON | : | |
| CORRECTIONAL INSTITUTION | : | |
| | : | |
| Respondent. | : | |

## REPORT AND RECOMMENDATIONS

Jessica Groves, a state prisoner proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court to consider the Petition (ECF Nos. 1, 1-1), the Return of Writ (ECF No. 10), Petitioner's Reply (ECF No. 14), and the state court record. (ECF Nos. 9, 11-1, 11-2, 11-3, 11-4). For the reasons that follow, it is **RECOMMENDED** that the Petition be **DENIED** and this action be **DISMISSED**.

## I.    FACTUAL BACKGROUND

On June 14, 2019, a Scioto County, Ohio grand jury indicted Petitioner on eleven counts, including aggravated murder, for the events associated with death of Petitioner's infant son, Dylan Groves. (ECF No. 9 at PageID# 110-113). Petitioner was tried by a jury January 6-10, 2020. (ECF No. 11-2 at PageID# 706-1793). The Fourth District Court of Appeals ("Court of Appeals") found that the following facts were adduced at trial:

{¶4} …Registered Nurse Darienne Liles worked at Southern Ohio Medical Center (SOMC) on January 10, 2019, when [Petitioner] and Daniel Groves (hereinafter Groves) arrived at the hospital at 5:25 a.m. Liles testified that [Petitioner] appeared to be "flat, disconnected and uncooperative," refused to provide a urine sample, and

refused to answer questions about prenatal care. [Petitioner] was completely dilated, but "not in pain, * * * very unusual for somebody who we've not administered pain medicine to." Moments before the baby's birth, Groves stated that [Petitioner] "had used heroin two days ago."

{¶5} SOMC staff eventually obtained [Petitioner's] urine sample that tested positive for amphetamines. Approximately 30 minutes after [Petitioner] entered the hospital, she delivered Baby Dylan (Dylan). Nurse Liles testified that Groves "seemed worried and almost afraid." "Whenever we were questioning her, they were both just making * * * eye contact with each other, not acting like they were paying much attention to us." "The only thing [Groves] said was that she [Petitioner] had used heroin that she was always too high to go to her prenatal care visits." * * * "[W]e thought he was almost looking to [Petitioner] for permission to answer our questions. I could feel a couple of times he wanted to say things or answer and he did not." Liles testified that neither [Petitioner] nor Groves requested to see Dylan after his birth.

{¶6} Registered Nurse Tori Howell cares for newborns in the SOMC nursery. Howell testified that because Dylan, born approximately one month early, had difficulty breathing, they removed him to the nursery. Howell also testified that (1) Dylan's preliminary screen showed "unconfirmed positive" for amphetamines, and (2) the umbilical cord tested positive for amphetamines, methamphetamines, fentanyl, opiates, and morphine. Howell further testified that, while Dylan was in the nursery for several days, Groves visited once and neither parent asked about Dylan's condition.

{¶7} SOMC Obstetrician-Gynecologist Dr. Darren Adams was on call when [Petitioner] and Groves arrived at the hospital. The hospital called Dr. Adams because [Petitioner] had no prenatal care and was ready to deliver. When Dr. Adams arrived, [Petitioner], dilated at nine and one-half centimeters, appeared distant and did not answer questions. Dr. Adams believed [Petitioner] might have been impaired because, typically, a mother that far dilated with no pain medication would be in extreme pain. [Petitioner], however, "was just distant, an -- an odd reaction." Dr. Adams delivered Dylan within minutes, and he weighed 5 pounds, 10 ounces, and was 19 inches long. Later that day, Dr. Adams returned to care for [Petitioner's] postpartum hemorrhage.

{¶8} Assistant Nurse Manager Stacey Riffitt testified [Petitioner] kept Dylan for 15 minutes after his birth, but "didn't hold him. She didn't ask how his condition was. She just said, 'Put him there on the wall.'" Also, Dylan was diagnosed with

neonatal abstinence syndrome, meaning that he had been exposed to drugs in utero and was in withdrawal. Dylan had tremors, could not quiet himself, and needed to be comforted. Riffitt explained that the umbilical cord test shows "every substance the mother used from 20 weeks gestation on." Riffitt also testified that Dylan required an oxygen treatment immediately after birth, but they weaned him from the oxygen treatment within 90 minutes and he was otherwise "very healthy" with no injuries.

{¶9} When Nurse Riffitt spoke with Groves in [Petitioner's] hospital room, Daniel Groves told Riffitt he had "just talked with the physician and asked if meth could be found in heroin." Groves also told Riffitt that [Petitioner] is a nurse who used heroin and, after she learned of her pregnancy, she continued to use heroin, "enough to keep the withdrawal symptoms from happening to her." Riffitt returned to the room and Groves' eyes "looked a little more glassy. He would not make eye contact with me. His speech was slow." Riffitt believed Groves was under the influence of something. Riffitt further testified that, after Dylan stayed at the hospital for five days to monitor drug withdrawal symptoms, the hospital discharged Dylan to Scioto County Children's Services (SCCS).

{¶10} SOMC Social Worker Christine Procter Frantz testified that Dylan's initial discharge plan permitted him to go home with Daniel Groves due to Groves' negative drug screen, and because he told SCCS that he did not know about [Petitioner's] drug use during pregnancy. Frantz also stated that, although SCCS considered the unconfirmed positive drug screen not to be a true positive, the hospital disagreed and sought to keep Dylan until they received the umbilical cord test results "because with mom and baby both being positive it should be an automatic removal."

{¶11} SOMC Social Work Services Manager Mandy Burchett testified that, after the hospital received the cord toxicology results on January 15, 2019, Dylan would be discharged to foster care.

¶12} On January 16, 2019, SCCS filed a complaint in the juvenile court and alleged Dylan (age six days), and [Petitioner's] other child, Daniel, Jr., (age 14), to be abused, neglected and dependent. SCCS also sought an ex parte order to place Dylan in SCCS custody and Daniel Jr. under an order of protective supervision.

{¶13} On January 16, 2019, the juvenile court awarded Dylan's custody to SCCS and, on January 28, 2019, the court further ordered: (1) the children remain in SCCS custody, (2) [Petitioner] complete a drug abuse evaluation and follow all

recommendations, and (3) [Petitioner] report to juvenile court and complete an assessment to participate in the Family Reunification Court.

{¶14} After foster parent and elementary school teacher Andrea Bowling received a call to ask her to foster parent a drug-dependent infant, she took physical custody of Dylan. Bowling observed Dylan's tremors, sweats, and his desire to be held at all times. Also, during visitation with Dylan's parents at SCCS, Bowling believed a "possibility that [Petitioner] was under the influence of something." When Dylan reunited with his parents on January 28, 2019, Bowling gave the parents diapers, supplies and a letter with Bowling's contact information and statement that she would be available if the parents needed anything. After the family visitation, Bowling also called SCCS about her concerns with [Petitioner's] demeanor.

{¶15} Scioto County Help Me Grow Service Coordinator Stephanie Jenkins administers an Early Intervention Program. In this program, staff will (1) conduct home visits to screen and monitor a child's progress, (2) assist parents to understand developmental milestones, (3) work directly with children, and (4) refer a family to other programs including WIC, Head Start, medical cards, food stamps, therapies, and transportation. After Jenkins received a January 25, 2019, referral, she made multiple attempts, from January to March, to contact Dylan's parents. However, on March 11, 2019, Help Me Grow terminated [Petitioner] and Groves from the program because of their lack of a response.

{¶16} SCCS Caseworker Patricia Craft, who served as Dylan's caseworker, testified that, after Dylan's removal from Groves' custody and the juvenile court's emergency order that awarded custody to SCCS, foster parent Andrea Bowling took physical custody of Dylan. A safety plan identified [Petitioner's] substance abuse as a threat and required [Petitioner] to (1) sign a release form, (2) obtain a drug and alcohol assessment, (3) submit to weekly contact and drug treatment, (4) remain outside the home unless supervised, and (5) submit to supervised visits.

{¶17} Caseworker Craft testified that she first met Dylan's parents on January 25, 2019, at a family team meeting. Participants at the meeting included Caseworker Johnson, Andrea Bowling, Craft, [Petitioner] and Daniel Groves. SCCS informed both parents that they should complete drug and alcohol assessments, participate in individual counseling, and comply with court orders. Groves also told Craft that he had a six-month leave from his employment at Rural King. Immediately after the team meeting, the parents had a one-hour visit with Dylan. Afterward, Bowling told Craft that she thought [Petitioner] was "loopy" and "on drugs." At that time Daniel, Jr. remained in Groves' custody.

4

{¶18} Caseworker Craft further explained that because Groves had no violent criminal history and no prior SCCS involvement, SCCS policy provided that Dylan should be returned to Groves if he could successfully pass another drug screen. Interestingly, although Groves' screen did test clean, neither Craft nor anyone else directly observed Groves during the drug screen process.

{¶19} SCCS returned Dylan to Daniel Groves on January 28, 2019. At the February 4, 2019, home visit, Caseworker Craft observed that Dylan appeared to be quiet and exhibited no visible injuries. Additionally, [Petitioner] was in treatment and SCCS required her to attend treatment "until further notice" and to continue to report to drug court.

{¶20} Between February 4 and 21, 2019, Caseworker Craft made multiple unsuccessful phone attempts to contact Daniel Groves. Craft and another caseworker also visited Groves' home but found no one. Craft then visited Daniel, Jr.'s school and gave him a note to ask Groves to call Craft. Craft also left notes in Groves' door and mailbox, and, on February 21, 2019, Craft visited Groves' residence. During this attempted visit, Craft observed Daniel, Jr. exit his school bus and enter the home. Craft also noticed two dogs and a chain with a "No Trespassing" sign but did not see cars. The next day, Craft again returned to Groves' home, but did not see cars.

{¶21} On February 25, 2019, Caseworker Craft completed her monthly home visit and observed that Dylan appeared to be clean, appropriately dressed and displayed no visible injuries. According to Groves, Dylan had recently visited the doctor and weighed 8 pounds, 9 ounces, and was 22 inches long. Groves also told Craft that [Petitioner] stayed at the residence only during the day, but Craft could not verify this information.

{¶22} At the time of the next monthly scheduled home visit on March 18, 2019, Groves told Caseworker Craft that he was in Canton visiting his ill father. At the rescheduled March 21, 2019, visit, Craft found no one home. After she returned to her office, Craft received voicemail from Groves that said he was in Canton with his father.

{¶23} At the March 27, 2019, juvenile court hearing, [Petitioner] appeared but Groves did not. The juvenile court adjudicated the children to be abused, neglected and dependent, pointed out that [Petitioner] did not complete the drug treatment

program, and concluded that Dylan's best interests required him to remain in SCCS custody pending disposition.

{¶24} At the March 28, 2019, home visit, Caseworker Craft interacted with Groves, [Petitioner] and Dylan. Although Craft did not inquire why Groves did not attend the March 27, 2019, adjudication, she did observe [Petitioner] feed Dylan. Also, Craft did not observe any injuries to Dylan. When both parents told Craft that they had kept all appointments and asked whether [Petitioner] could return home, Craft said she would ask her supervisor. Craft also reminded them about the April 3, 2019, court hearing and her next home visit on April 9, 2019.

{¶25} On April 3, 2019, Groves texted Caseworker Craft and said that, although he and [Petitioner] had been ill, they drove to Canton to visit Groves' father when their car broke down and they became stranded. On April 17, 2019, Craft unsuccessfully attempted to inform Groves that the guardian ad litem wanted to visit their home and that Craft's next home visit would be April 24, 2019. At this point, because Groves had texted Craft from four different numbers, she and the guardian ad litem attempted to contact Groves at all four numbers. Further, Craft learned that, since February 8, 2019, [Petitioner] had not complied with her individual therapy visits, and she last attended a group session on March 26, 2019.

{¶26} At the April 18, 2019, juvenile court hearing, Groves' attorney, [Petitioner's] attorney, Caseworker Craft and the SCCS attorney all attended, but [Petitioner] and Groves did not. At the conclusion of the hearing, the juvenile court ordered Dylan to remain with SCCS.

{¶27} On April 19, 2019, Caseworker Craft again visited Groves' home, knocked on the door for several minutes, then left cards in the door and mailbox that asked Groves to call. Craft also contacted Rural King because she thought Groves could be at work, but Rural King informed her that Groves quit his job in 2018. That same day, Groves texted Craft and said he was still "up north" and a friend watches his home when he is away. Groves also told Craft that Dylan was "doing great. Growing like a weed. LOL." Because of car trouble, Groves said his uncle could bring him home Monday or Tuesday and he would contact Craft.

{¶28} Caseworker Craft continued to attempt to contact Dylan's parents on April 19, 22, 23, and 24, 2019. Craft then visited school to talk with Daniel, Jr., who appeared to be nervous, but told her Dylan was fine. When Craft asked if [Petitioner] stayed at their home, first Daniel, Jr. said, "yes," then he said

"occasionally." When asked about his ill grandfather in Canton, Daniel, Jr. replied, "Who was that?"

{¶29} On April 24, 2019, SCCS took custody of Daniel, Jr. and placed him with an aunt and uncle. Shortly thereafter, Caseworker Craft received Groves' text that asked why Daniel, Jr. did not come home from school. Craft then visited Groves' home and, because of parked cars assumed everyone to be home, but received no answer. Craft then texted Groves to tell him to bring Dylan, along with the children's personal items, to the agency the next day. Groves said he would do so but did not. On April 25, 2019, the juvenile court continued protective supervision of Daniel, Jr., and continued Dylan's temporary custody with SCCS.

{¶30} On April 30, 2019, Caseworker Craft filed a missing person report with the Scioto County Sheriff's Department. Craft continued to communicate with Groves and, on May 3, 2019, visited the residence, along with another caseworker and a deputy sheriff. On May 7, 2019, Craft returned to the residence and observed all vehicles present. On May 15, 2019, SCCS visited the residence and noted one missing vehicle. On May 23, 31, and June 7, 2019, SCCS attempted additional home visits, but to no avail. Craft also testified that other agencies, including the juvenile court and Care Source, searched for Groves.

{¶31} On June 10, 2019, Caseworker Craft learned that law enforcement had arrested both Groves and [Petitioner] and "Jessica and Daniel was [sic] telling them that I came several months ago and took the child." Craft, however, testified that she last observed Dylan on March 28, 2019. Craft also conceded on cross-examination that SCCS did not issue an Amber Alert because a supervisor believed that, if an Amber Alert goes out, it "would give a bad reputation for the agency because we lost a child."

{¶32} Pediatrician Dr. Mohammad Ali first observed Dylan at the hospital soon after his birth, then a few times at his office. Dr. Ali testified that Dylan stayed at the hospital longer than normal due to drug withdrawal symptoms. On January 16, 2019, Dr. Ali observed Dylan in his office for a well-newborn check, and Dylan's foster parent informed him that Dylan sneezed, perspired excessively, had tremors, but otherwise appeared to be well. Dr. Ali learned about the abnormal newborn 17-hydroxy progesterone screening, that indicated elevated risk for congenital adrenal hyperplasia, but Dylan's care transferred to a different pediatric practice and miscommunication occurred about whether the screening had been repeated. Dr. Ali also testified that, although he did not know whether the screening had been

repeated, this abnormality would not cause bone fractures, bruising or swelling of the head.

{¶33} Christ Care Pediatrics Pediatrician Dr. Gregory Hudson testified he first observed Dylan on February 7, 2019. Dr. Hudson discussed the abnormal 17-hydroxy progesterone screening and ordered additional lab work to recheck the abnormal panel. As instructed, [Petitioner] and Groves returned to Dr. Hudson's office on February 21, 2019, when Dr. Hudson learned that Groves had completed all but one lab test. Because Dr. Hudson was not the attending pediatrician at Dylan's birth, and because he did not know that the hospital had completed a 17-hydroxy progesterone test, Dr. Hudson ordered another test. Additionally, although Dylan exhibited no injuries at his February 21, 2019, office visit, he weighed on the low end of normal. Consequently, Dr. Hudson scheduled a March 7, 2019, return visit. Groves, however, did not return with Dylan.

{¶34} Dr. Hudson further explained that, due to the testing mix-up, his office sent two letters to [Petitioner] to stress the importance of another test and threatened that, if [Petitioner] did not repeat the screening, "they will involve Children's Protective Services." In addition to the letters, Dr. Hudson's office called Groves and [Petitioner], but received no response. Dr. Hudson further testified that in his 30 years of experience, he had never seen a two-to-three-month-old baby fracture his own skull, ribs, arms or legs.

{¶35} Mahajan Therapeutics Therapist Jessica Byrd testified that SCCS referred [Petitioner] to their facility for assessment and treatment. [Petitioner] completed her drug and mental health assessments on January 18, 2019, attended an individual therapy session on February 8, 2019, and submitted to several supervised drug screens. However, after February 8, 2019, [Petitioner] became "very inconsistent and eventually then just totally stopped coming." Byrd also contacted SCCS on February 14, 15, 22, 27, March 1, and April 2, 2019, about [Petitioner's] noncompliance. Apparently, [Petitioner] attended one group counseling session on March 26, 2019, but Byrd said she was "a little bit different. * * * she was very defensive. It seemed like she was edgy, a little angry, just upset that Children's Services like wasn't letting her husband just be with the baby." Byrd also suspected [Petitioner] was under the influence of drugs or alcohol at her March 26, 2019, session.

{¶36} Scioto County Juvenile Court Intake Officer and Investigator Greg Dunham testified that, after SCCS removed Dylan, the juvenile court ordered [Petitioner] to report to Dunham twice per month. Dunham met with [Petitioner] on January 24,

2019, reviewed her requirements and completed a drug court assessment. [Petitioner], however, missed three report dates and did not appear until March 28, 2019, when she told Dunham she missed appointments because she had no transportation. Dunham also visited [Petitioner's] residence on May 31, June 3, June 4, June 5, and June 10, 2019, but could not locate [Petitioner].

{¶37} Scioto County Sheriff's Captain John Murphy visited the Groves home on May 20, 2019, and attempted to locate Dylan, but the driveway had been "cabled off" with motion detectors. Murphy did hear dogs inside the home, but he did not see anyone. When Murphy began to leave, he spoke with a neighbor who told him that "they [the Groves] leave early morning hours and they come back late at night. They're usually on a four-wheeler riding up and down the roadway." During this conversation, Murphy observed [Petitioner] and Groves riding atop a four-wheeler. Murphy attempted to stop them, but Groves "took off through a field and I gave chase through the grassy field, and they hit the woods and we could not pursue any further."

{¶38} Scioto County Sheriff's Detective Adam Giles testified he secured a search warrant on June 10, 2019, and visited the Groves home, along with other officers. After officers surrounded the home, they knocked on the door and asked the occupants to exit. Approximately 15 to 20 minutes later, [Petitioner] exited, screamed, cursed and informed officers that SCCS had already taken Dylan. [Petitioner] would not, however, answer whether Groves remained inside the home. When Groves did not exit, officers sent a robot into the home. Eventually, officers apprehended Groves and he told them he had "been asleep the whole time." When Giles asked about Dylan, Groves said SCCS had already taken him.

{¶39} Otway Volunteer Fire Department firefighters Steven Gambill and Dan Shirey testified that the department used a truck and chain saws to access a logging road to search a well, but the water level prevented a search. Instead, they dropped a hook into the well and retrieved two milk crates, connected with a heavy padlocked chain. Montgomery County Coroner's Office Forensic Pathologist Dr. Susan Brown received Dylan's body in two milk crates, connected with a chain and "three padlocks * * * 12 zip ties, and * * * eight metal wires * * * [and] 18 large rocks." Dylan had been "wrapped in multiple layers of plastic and around all of this plastic is this iron anchor type device." Dr. Brown testified that Dylan's body exhibited (1) skull fractures (that did not occur simultaneously), (2) bruises on right side of chest and left leg, (3) laceration on left arm, (4) fractures of the left humerus or the upper arm bone * * * and * * * fracture of the left radius and ulna, the bones of the left forearm, (5) fractures of left tibia, and (6) on the sixth rib an "old healing

fracture, and the same thing on rib seven next to it, a large nodular area, which is a healing old fracture, left rib six and seven." The examination further revealed that the rib fractures did not occur at the same time as the other fractures. Dr. Brown testified that Dylan's "cause of death is homicidal violence of undetermined etiology." She explained Dylan had been a victim of blunt force trauma, but the "specific cause of death can't be determined because a typical exam could not be performed because his body was decomposing from being concealed in -- in water for months." Dr. Brown also believed that the fractures showed at least three different traumas. Toxicology reports also detected methamphetamine and amphetamine in Dylan's liver.

{¶40} Scioto County Sheriff's Detective Jodi Conkel interviewed [Petitioner] after her arrest and described her as "very standoffish, cold, didn't really want to talk to me, kind of annoyed." [Petitioner] told Conkel that SCCS had taken Dylan and Daniel, Jr., and that she did not use illegal drugs. Later that day, Conkel interviewed Groves who also maintained that SCCS had taken Dylan. Conkel said Groves appeared to be "dope sick," which he did admit to Conkel. Groves later told Conkel that he found Dylan in his crib deceased.

{¶41} On June 12, 2019, Detective Conkel interviewed [Petitioner] and Groves. During this conversation, Groves admitted that SCCS did not take Dylan. The Sheriff's Office also accommodated Groves' request to talk to [Petitioner], and a video recording of their jail conversation revealed additional information:

> DEFENDANT D. GROVES: When they took me out there yesterday -- wanted me to take them where he was at, and I took them -- some bullshit place because – don't tell them where he is because if they find his body --
>
> DEFENDANT J. GROVES: (Inaudible).
>
> DEFENDANT D. GROVES: If they find his body and if they find out where he had a broken arm and shit, we're fucked. It don't matter.
>
> DEFENDANT J. GROVES: They don't know where he's at. I don't know where he's at.

{¶42} At some point, Groves agreed to take authorities to Dylan's body. Detective Conkel also testified about a calendar found in the mobile home with a notation "Worse [sic.] day ever" on April 24, 2019, the date SCCS removed Daniel, Jr.

{¶43} Daniel, Jr., the co-defendants' 15-year-old son, testified he first found out about [Petitioner's] pregnancy "somewhere around in November" 2018. Before his April 24, 2019, removal from the home, Daniel, Jr. observed bruising and swelling on Dylan's head, and, when he asked his parents what happened, Groves told him "about him getting a -- like a dream catcher stuck within his arm and him swinging a small tiny stone up to his head. I'm not sure if that caused the injury -- the swelling of his head. I don't believe it was." Daniel, Jr. also testified that every couple of months, he provided his urine to Groves, both before and after Dylan's birth, and Groves then put the urine in a capped lid bottle.

{¶44} At the close of the state's case-in-chief, the trial court conducted a lengthy and thorough discussion with the codefendants and informed them about their right to testify or not to testify, and the consequences of either choice, including cross-examination about prior criminal offenses. After both co-defendants informed the court that they wished to testify, [Petitioner] testified as follows:

> Q [Jessica's Counsel Mr. Stratton]: Jessica, did you, and you only, cause the death of your son, Dylan Groves?
> A: Yes.
> Q: Did Daniel Groves participate in the killing of Dylan?
> A: No.
> Q: Was Daniel Groves aware of any of the injuries that you caused Dylan that may have led to his death?
> A: No.
> Q: Did you hide all the injuries that you caused Dylan from your husband?
> A: Yes.
> * * *
> Q: Jessica Groves, the injuries that Dylan sustained happened on what date?
> A: On March 27th.
> Q: Dylan died on what date?
> A: March 28th.
> * * *
> Q: Where did you take Dylan after he died?
> A: He was at our house for a couple days.
> Q: And then where did you take him?
> A: To the well.
> Q: Did you murder Dylan Groves?
> A: Not intentionally.

{¶45} On cross-examination, the state asked [Petitioner] how she caused Dylan's death, to which she replied, "[i]t was an accident." When asked about the rib fractures, [Petitioner] replied, "by dropping him." When asked about the skull fracture, [Petitioner] said, "I don't remember. * * * It had to be from dropping him." When asked about the upper arm fracture, [Petitioner] replied "Nothing that I ever did was intentional. * * * I have to live with this for the rest of my life. *** You have devoured my family." When pressed for details about how she caused Dylan's death, [Petitioner] told the prosecutor, "I've admitted to my guilt. * * * And I have to live without -- my children. * * * I'm done talking to you." At that point, the trial court admonished [Petitioner] that she must submit to cross-examination or her testimony would be stricken. [Petitioner] then responded to most questions "I don't remember." Eventually, [Petitioner] did state that she did not have a clear mind "because of drugs," and that Groves, her co-defendant, participated only in the preparation and concealment of Dylan's body.

{¶46} After Groves testified about his prior shoplifting conviction, he addressed the facts in the case at bar and stated that [Petitioner] first told him about her pregnancy in October or November 2019. About five minutes into their trip to the hospital for Dylan's birth, [Petitioner] also told Groves that "she had been using drugs and that she had not went to her [prenatal] appointments." According to Groves, he hesitated to answer medical questions at the hospital because he had not processed what he had just learned, and that [Petitioner] could be "intimidating." Groves did say he visited Dylan once in the nursery and inquired about his health. Groves also claimed he was not impaired while at the hospital, but that he may have given that appearance because he had "been up for over 30 some hours straight." Additionally, Groves testified that he provided his own urine sample at the hospital, but admitted that, on other occasions, he asked Daniel, Jr. for his urine, but always for a friend to use for drug tests. Groves explained the reason he did not give his urine to his friend is because he "smoked some marijuana and occasionally would hit -- smoke, you know a little." Thus, Groves claimed he did not use his son's urine to fake his own drug test.

{¶47} Groves also testified that he recalled seeing bruises on Dylan's head but did not see swelling. Groves believed Dylan's head bruise resulted from an accident with a dream catcher, and that the bruise appeared to be on Dylan's forehead, not all around his head. Groves testified he did not cause Dylan's death and he was not present when Dylan died. Instead, Groves said he found Dylan deceased in his crib. Groves also stated that, after [Petitioner] told him that because he had custody SCCS would blame him for Dylan's death, he became scared and lied to law

enforcement. Groves did admit, however, that he told Detective Conkel that he had "seen [Petitioner] hit him probably four times, probably," * * * "because he wouldn't stop crying and because she was so * * * agitated and aggravated and if I brought her coke [cocaine] she wouldn't be that way." Groves also admitted he told Conkel, "[o]ne time I saw her, she had a hold of him like below his arms. * * * Like by his ribs or something and she just kind of went ahh." Once again, Groves said he did not tell the truth because he feared "he would get the blame for it completely."

{¶48} After hearing the evidence, the jury found [Petitioner] guilty of: (1) aggravated murder, in violation of R.C. 2903.01(C), an unclassified felony, (2) murder, in violation of R.C. 2903.02(B), an unclassified felony, (3) kidnapping, in violation of R.C. 2905.01(A)(5), a first-degree felony, (4) child endangerment, in violation of R.C. 2919.22(A), a third-degree felony with a serious physical harm specification, (5) tampering with evidence, in violation of R.C. 2921.12(A)(1), a third-degree felony, (6) interference with custody, in violation of R.C. 2919.23(A)(1), a fourth-degree felony with a physical harm specification, (7) gross abuse of a corpse, in violation of R.C. 2927.01(B), a fifth-degree felony, and (8) four counts of felonious assault, in violation of R.C. 2903.11(A)(1), second-degree felonies.

(ECF No. 9 at PageID# 208-230). The trial court sentenced Petitioner to life plus thirty-two years imprisonment. (ECF No. 11-2 at PageID# 1816).

## II.    PROCEDURAL HISTORY

On May 2, 2019, Petitioner filed a notice of appeal to the Court of Appeals. (*Id.* at PageID# 134-142). Petitioner's brief raised the following assignments of error:

(1) Was trial counsel ineffective when he abandoned his role as a defense attorney, adopted a trial strategy which was beyond the pale of anything resembling competent representation and essentially prosecuted his client in order to "save" her co-defendant/husband?

(2) Was [Petitioner] unfairly prejudiced when her trial counsel made the following mistakes and/or omissions?

   a)  Failing to obtain investigative services despite being legally entitled to the same;
   b)  Failing to attempt to sever her case from her co-defendant/husband;

    c) Promising that [Petitioner] would take full responsibility for the 'murder' of her child during opening statement but allowing [Petitioner] to be completely unprepared to testify regarding the same;

    d) Not advising [Petitioner] to take a plea to her indictment rather than try her case and therefore doom her to the inevitable outcome of being sentenced to life without the possibility of parole;

    e) Failing to investigate, pursue, or present any mitigation evidence on the behalf of [Petitioner]; and

    f) Failing to conduct a reasonable cross examination of the coroner regarding any other possible cause of death of the infant child.

(*Id.* at PageID# 145-146).

On February 8, 2022, the Court of Appeals issued a decision affirming the conviction and sentence. (*Id.* at PageID #206-271). Petitioner filed a motion for leave to file a delayed appeal with Supreme Court of Ohio and a memorandum in support of jurisdiction. (*Id.* at PageID# 275-506). On August 30, 2022, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID# 509).

## III.    FEDERAL HABEAS PROCEEDINGS

On June 12, 2023, Petitioner filed the instant federal habeas petition. Petitioner contends that her trial counsel was ineffective for: (1) adopting a strategy that involved admitting the Petitioner's guilt, (2) failing to request funding for investigative services, (3) failing to file a motion to sever her case from her co-defendant husband, (4) failing to adequately prepare her for cross-examination, (5) failing to advise her to plead guilty, (6) failing to adequately cross-examine the state's key witness, and (7) failing to present any mitigation evidence at sentencing.[1]

---

[1]     Petitioner's claims have been renumbered and rephrased for clarity. Petitioner named her claims as: Ground A (1): Trial counsel was ineffective in adopting a trial strategy so far beyond the realm of legitimate trial strategy that ordinary trial counsel would scoff at hearing of it. (ECF No. 1-1 at PageID# 44); Ground B: Trial counsel made a number of errors and omissions during the litigation and trial of [Petitioner] which amounted to ineffective assistance of counsel when viewed in totality (*id.* at PageID# 59); Ground B (1): Trial counsel failed to obtain and request investigative services as provided for under the law (*id.* at PageID# 59); Ground B (2): Trial counsel failed to attempt to sever her case from her co-defendant/husband (*id.* at 65); Ground B (3): [Petitioner] was inexplicably unprepared to answer the most basic questions about how she caused the injuries to her child (*id.* at PageID# 73-75); Ground B (4):[Petitioner] should have been advised to plea[d] guilty rather than elect to trial by jury (*id.* at PageID# 78.); Ground B (5): Trial counsel completely failed to conduct a meaningful examination of the [state's] key witness. (*id.* at PageID#

On October 11, 2023, Respondent filed a Return of Writ. (ECF No. 10). Respondent contends that Petitioner's claims lack merit because the Court of Appeals' dismissal of the postconviction petition was neither contrary to nor an unreasonable application of federal law. (*Id.* at PageID# 548-579).

## IV.  STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA. . . imposes a highly deferential standard for evaluating state–court rulings and demands that state-court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

84); Ground B (6): [Petitioner's] trial counsel failed to present any mitigation evidence whatsoever at sentencing. (*Id.* at PageID# 87.).

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained the meaning of the standards found in § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495.

*Lang v. Bobby*, 889 F.3d 803, 810 (6th Cir. 2018).

Moreover, under § 2254(d)(2), a state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a state court's factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted). Moreover, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

**V.     DISCUSSION**

"In all criminal prosecutions," the Sixth Amendment affords "the accused. . . the right. . . to Assistance of Counsel for his defence." U.S. CONST. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010). With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689.

As to the second prong, the Supreme Court held that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome." *Id.* at 694.

Where an exhausted claim of ineffective assistance of trial counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S.

111, 123 (2009). That is, "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether trial counsel was ineffective, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. The Supreme Court clarified the double deference that is due:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal citation omitted). A petitioner must show the state court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement." *Id.* at 103. Congress "meant" this standard to be "difficult to meet." *Id.* at 102.

## A. Trial Strategy that Involved Admitting Petitioner's Guilt

In her first allegation of ineffective assistance of counsel, Petitioner contends:

…trial counsel's actions constituted a vast deviation from any reasonable course of representation and that it ultimately amounted to an abdication of his duty to [Petitioner]. From the outset of the case during his opening statement, trial counsel called his client a murderer and stated that she would be taking full responsibility for her crimes and sins. This incomprehensible approach clearly impacted and prejudiced [Petitioner] in this matter. Furthermore, the absurdness of this strategy was exacerbated when [Petitioner] testified that any injuries caused to the child were not intentional. From the outset of the case, trial counsel appeared to try and direct the jury's attention to the problem of substance abuse in Scioto County and the surrounding area. Trial counsel made no attempts whatsoever to discuss the elements contained in the alleged offenses and present anything resembling a defense to the same. Review of the record indicates that such there were legitimate defenses available in this matter. None of the state of Ohio's witnesses could testify as to who caused any of the injuries which caused Dylan's death. No confessions

18

had been made by [Petitioner]. [Petitioner] denied on multiple occasions ever deliberately causing any harm to her child. Trial counsel cast all of this aside and elected to pursue legal theatrics as opposed to anything resembling a legitimate defense…

(ECF No. 1-1 at PageID# 47).

The Court of Appeals rejected this claim on Petitioner's direct appeal. (ECF No. 9 at 232-251). Specifically, the Court of Appeals found that Petitioner's trial counsel was not ineffective because he based his actions on a strategy to which Petitioner explicitly agreed. (*Id.* at 234).

On January 7, 2020, before opening statements in the trial began, Petitioner's counsel, Shawn Stratton, advised the trial court that Petitioner intended to testify and "my opening statement and the statements through questioning will have to do with that testifying, and that [Petitioner] wants me to proceed accordingly." (ECF No. 11-2 at PageID# 986). Upon questioning by the trial court, Petitioner answered affirmatively that she understood what her counsel was indicating, and she understood that she was not required to testify and was not required to make the decision immediately. (*Id.* at PageID# 987-988).

Petitioner's counsel made the following comments during opening statement:

…My client, Jessica Groves, was, and still is, a drug addict. There is no doubt about that fact. She and she alone, caused the injuries to Dylan Groves, which lead to his death. She murdered Dylan Groves. She will testify that she murdered Dylan Groves. She will testify to the injuries that she caused to Dylan Groves. The two-inch fracture on the skull, the one-inch fracture on the skull, the half inch laceration on the left arm, fracture of the left humerus, fracture of the left radius and ulna, red contusion on the right side of the chest, healed rib fractures and the drugs in Baby Dylan's system, these are the injures caused to Dylan Groves by Jessica Groves.

Finally, you might ask why put everybody through this ordeal? Why put everybody through this trauma? The answer is because she's going to do the right thing right now. And that right thing is to take personal responsibility for her crimes and sins. And that right thing also is to protect and defend an innocent man.

Daniel Groves had nothing to do with the death of—Daniel Groves had nothing to do with the death of Dylan Groves and did not cause these injuries. He was foolishly unaware of these injuries. And I say foolishly because hindsight is always 20/20,

and sometimes you're oblivious to what's going on. This is especially true for someone you have known for 20 years and that you have loved.

Dylan Groves died on March 28th and Daniel found him unresponsive. Once he found him panic and confusion set in. And with that panic and confusion came poor decision that we saw--saw here today. Did he help hide the body? Yes. Did he suggest the well? Yes. He knew where this well was. Did he help craft the coffin and preserve Dylan? Yes, he did. But that is all he did.

Jessica Groves is the person responsible for the death of Dylan Groves. She is here in front of you today taking personal responsibility for her crimes, and her sins. Thank you, Your Honor.

(*Id.* at 1007-1008).

After opening statements, the trial court recessed and engaged in the following colloquy with Petitioner:

| THE COURT: | Back on the record in State of Ohio versus Daniel Groves and State of Ohio versus Jessica Groves, case numbers 19CR586 (A) and (B). Counsel and the Defendants are present. The jury has been excused to the jury room while we await the State's first witness. I was going to do this during the first break. The first break came a little earlier than what I anticipated. This morning we discussed with Ms. Groves outside the of the jury's presence her intent to testify in this matter. We discussed a little bit about defense strategy, and I thought this might be a good opportunity to --for me to have a short conversation with her regarding that. Ms. Groves, you've heard your lawyer's opening statement in this matter; is that correct? |
| --- | --- |
| J. GROVES: | Yes, Your Honor. |
| THE COURT: | All right. We had some discussions this morning about your ultimate defense strategy in this matter. Was that consistent with your strategy as you intend to present your defense in this matter? |
| J. GROVES: | Yes, Your Honor. |
| THE COURT: | All right. Have you had plenty of opportunity to consult with him about this strategy? |
| J. GROVES: | Yes, I have, Your Honor. |

| | |
|---|---|
| THE COURT: | You understand that the State still has to prove their case in this matter, regardless of his opening statement? But do you understand that potentially that--at least in some respects in this--some counts of this indictment could--could harm your chances as to an ultimate outcome. Do you understand that? |
| J. GROVES: | Yes, sir. |
| THE COURT: | And you've contemplated this before you've proceeded with this strategy; is that correct? |
| J. GROVES: | Yes, sir. |
| THE COURT: | All right. Do you have any questions for me? Anything you need to bring to my attention at this point? |
| J. GROVES: | No, Your Honor. |
| THE COURT: | All right. Do you need any time to discuss this case further with your lawyer before we proceed with the State's presentation of evidence? |
| J. GROVES: | No, Your Honor. |

(*Id.* at 1015-1017).

Later, before Petitioner was slated to take the stand, the trial court asked Petitioner again if she still wanted to take the stand and Petitioner answered in the affirmative. (*Id.* at PageID# 1711). Petitioner admitted on direct exam that she caused Dylan's death. Petitioner testified that her husband's only participation was to help her dispose of Dylan's body in the well. (*Id.* at PageID# 1717, 1729-1732).

The Sixth Amendment prohibits counsel from conceding a defendant's guilt without his express consent. "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Robert Leroy Mccoy v. Louisiana*, 584 U.S. 414, 423 (2018), citing U.S. CONST. amend. XI (emphasis added); ABA Model Rule of Professional Conduct 1.2(a)

(2016) (a "lawyer shall abide by a client's decisions concerning the objectives of the representation"). Notably, Petitioner does not argue that counsel employed a strategy that was against her wishes. To the contrary, the record reflects that Petitioner instructed her counsel to concede her guilt.

Counsel does not violate a defendant's right to effective representation "by yielding to the defendant's ultimate authority in either a trial strategy or a fundamental decision." *See Taylor v. Steele*, 6 F.4th 796, 802 (8th Cir. 2021) (holding that habeas petitioner could not show deficient performance where counsel followed petitioner's express direction not to present closing argument during the penalty phase of a capital murder trial); *see also United States v. Wellington*, 417 F.3d 284, 289 (2d Cir. 2005) ("[T]o the extent that defendant instructed his counsel to pursue a course of action that defendant now complains of, there was no abridgement—constructive or otherwise—of defendant's Sixth Amendment right to effective assistance of counsel."); *Cochran v. United States*, No. 414CR0022HLMWEJ1, 2021 WL 4234965, at *8 (N.D. Ga. July 30, 2021), *report and recommendation adopted*, No. 414CR02201HLMWEJ, 2021 WL 3674176 (N.D. Ga. Aug. 19, 2021) ("Because movant directed his counsel not to pursue a consent defense, and counsel acquiesced to that direction, movant cannot show that his counsel's performance was deficient."); *Smith v. Falkenrath*, No. 4:21-CV-0532-DGK, 2022 WL 17672634, at *4 (W.D. Mo. Dec. 14, 2022), *certificate of appealability denied*, No. 23-1076, 2023 WL 4560008 (8th Cir. Apr. 13, 2023) (finding that counsel was not ineffective for posing questions to the medical examiner the defendant insisted upon after warning of adverse consequences).

Petitioner made an informed decision to direct her counsel to concede her guilt with full knowledge that her choice could harm her ability to obtain a favorable outcome.[2] Petitioner's post

---

[2]       Petitioner does not contend that she was incompetent. In fact, the record reflects that her competency was evaluated in advance of trial and was stipulated to by the defense. (ECF No. 9 at PageID# 115-125).

hoc regret that her counsel followed her directives does not render her counsel's performance deficient.

In any event, considering the overwhelming evidence of Petitioner's guilt, she cannot demonstrate that the outcome of the trial would have been different if counsel had not conceded her guilt per her instruction. The state's witness gave detailed testimony about how Dylan came to be in the custody of the state days after his birth, how Petitioner and her husband kept Dylan's whereabouts concealed from the state, the state's attempts to locate Dylan, and the involvement of law enforcement. (ECF No. 11-2 at PageID# 1250-267, 1406-1422, 1423-1428).

Otway volunteer fireman gave harrowing accounts of their efforts to retrieve Dylan's remains from the bottom of a 30-foot well. (*Id.* at PageID# 1483-1519). The medical examiner testified that she received Dylan's body encased in two milk crates that were zip tied together, chained, and padlocked. (*Id.* at PageID# 1529). She had to cut through multiple layers of plastic and duct tape to reach Dylan. (*Id.* at 1530-1531). The medical examiner testified that Dylan had a bruise on his right leg, a laceration on his right arm, a fractured left radius and ulna, a fractured left tibia, two old rib fractures on the left side, a one-inch parietal skull fracture, and a two-inch parietal skull fracture that showed some signs of healing. (*Id.* at PageID# 1534, 1536-1538, 1540). Dylan's toxicology report was positive for methamphetamine and amphetamine. (*Id.* at PageID# 1547). The medical examiner testified that Dylan's cause of death was homicidal violence. (*Id.* at PageID# 1543).

Petitioner's fifteen-year-old son, Daniel Groves, Jr., testified that he once saw black and purple bruising and swelling on Dylan's head. (*Id.* at PageID# 1679). Daniel Groves, Sr. testified that he found Dylan dead in his portable crib on March 28, 2019. (*Id.* at PageID# 1759). According to Daniel, Sr., Petitioner convinced him that he would be blamed for Dylan's death because

Children's Services was involved, and he had custody. (*Id.* at PageID# 1759-1760). During cross-examination, the state elicited testimony that Daniel, Sr. told Detective Conkel that he saw Petitioner hit Dylan four times because he would not stop crying. (*Id.* at PageID# 1777-1778). Daniel, Sr. admitted that he was concerned that Petitioner was a danger to Dylan and observed Petitioner being aggressive with him. (*Id.* at PageID# 1778, 1780). He also saw Petitioner pick Dylan up aggressively and opined that it might have caused the rib fractures. (*Id.* at PageID# 1779-1780).[3]

Even if Petitioner's counsel had not acceded to a strategy to admit her guilt, the nature and extent of Dylan's injuries, along with Daniel, Sr.'s observations of Petitioner's aggressive treatment of him, established the state's burden of proof that Petitioner purposefully caused Dylan's death.[4]

In sum, Petitioner's trial counsel had a duty to abide by Petitioner's decisions on the objectives of representation. He did not have a duty to defy Petitioner's strategy directives, even if they were unwise. Petitioner cannot demonstrate that her counsel's performance was deficient. Moreover, Petitioner cannot show that she was prejudiced because the state would have established its burden of proof notwithstanding Petitioner's admission of guilt.  For these reasons, the Court cannot conclude that the Court of Appeals dismissal of Petitioner's claim of ineffective assistance of counsel based on admission of guilt to the jury was contrary to or an unreasonable application of *Strickland*.

---

[3]     The evidence of Petitioner's guilt, without Daniel Groves, Sr.'s testimony is discussed in Section V(C), *infra*.

[4]     Because counsel admitted that Petitioner killed Dylan, the Court interprets Petitioner's claim as a challenge to the trial strategy with respect to the aggravated murder conviction. The jury was instructed: "you must find beyond a reasonable doubt that…the Defendant, or either of them, did, or as an accomplice, purposely, caused the death of… Dylan Groves. (ECF No. 11-2 at PageID# 1829).

Out of an abundance of caution, the Court also finds that the state would have met its burden of proof as to the remaining counts, the specific elements of which are found at ECF No. 11-2 at PageID# 1832-1838.

### B. Failure to Hire an Investigator

In her next claim, Petitioner contends that her counsel was ineffective for failing to request funding for an investigator pursuant to O.R.C. § 2929.024. Petitioner believes that if her counsel had retained an investigator, "there exists a strong probability that counsel could have pursued some other defense "strategy" at trial other than refer to his client as a murderer…" (ECF No. 1-1 at PageID# 61). The Court of Appeals rejected Petitioner's claim because she did not demonstrate a particularized need for an investigator, nor did she establish prejudice due to the overwhelming evidence of her guilt. (ECF No. 9 at PageID# 253).

A habeas petitioner cannot show deficient performance or prejudice resulting from counsel's failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material to his or her defense. *See Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002); *see also Welsh v. Lafler*, 444 F. App'x 844, 851 (6th Cir. 2011) (finding that a failure to present a detailed and convincing account of what facts a private investigator would have found is fatal to satisfying the prejudice prong of *Strickland*).

Here, Petitioner presents nothing more her personal belief that she would have been able to present a more effective defense if her counsel had hired an investigator. This conclusory allegation is insufficient to establish an ineffective assistance of counsel claim. Additionally, considering Petitioner's instructions to her trial counsel to admit her guilt, the Court cannot conclude that it was deficient performance for her counsel to expend resources that would have been counterproductive to her chosen trial strategy. The Court of Appeals' dismissal of this claim was neither contrary to nor an unreasonable application of *Strickland*.

### C. Failure to File a Motion to Sever

Petitioner contends that her counsel was also ineffective for failing to file a motion to sever her trial from her co-defendant husband. Petitioner contends that severing her case from her husband's would have benefited her because the state was unable to prove who inflicted the injuries on Dylan. (ECF No. 1-1 at PageID# 67). The Court of Appeals dismissed Petitioner's claim, finding that trial counsel was not ineffective for failing to file a motion to sever because the co-defendants' trial strategies were not mutually antagonistic:

> In the case sub judice, we recognize that both [Petitioner] and her co-defendant testified at trial and that the essence of their testimony, that [Petitioner] alone caused Dylan's death and her co-defendant husband participated only in concealing Dylan's body, is not in conflict. Thus, we cannot conclude that counsel's failure to request to sever the cases constitutes ineffective assistance. As stated above, the trial court fully, openly and thoroughly discussed with the parties their desired trial strategy to ensure that they fully understood the ramifications of their plan. Although unusual, trial counsel did obey his client's wishes in light of the trial court's numerous warnings and admonitions that once again, fully informed the parties of the consequences of their strategy.
>
> Additionally, even without [Petitioner's], or her co-defendant's, testimony, the jury would have heard testimony and evidence that (1) [Petitioner] lacked prenatal care for Dylan due to drug use, (2) [Petitioner] was under the influence of drugs when she arrived at the hospital, (3) [Petitioner] did not cooperate with hospital staff, (4) [Petitioner's] test results revealed a positive test for methamphetamines, fentanyl, and opiates, (5) [Dylan's] umbilical cord was positive for amphetamines, methamphetamines, fentanyl, opiates and morphine, (6) appellant showed little interest in Dylan at the hospital, (7) [Petitioner] did not comply with the SCCS case plan, (8) [Petitioner] failed to complete drug treatment, (9) [Petitioner] fled from law enforcement, (10) [Petitioner] lied to investigators, (11) Dylan, while born with neonatal abstinence syndrome, was otherwise healthy when he left the hospital, (12) Dylan was a victim of blunt force trauma and his cause of death was homicidal violence of undetermined etiology, and (13) [Petitioner] and her co-defendant husband discussed during a jailhouse conversation the location and condition of Dylan's body.
>
> After our review, and in light of the foregoing, we conclude that [Petitioner] did not establish that she suffered prejudice from the joint trial and from counsel's failure to file a motion to sever appellant's trial from the trial of her co-defendant.

(ECF No. 9 at PageID# 258-259).

A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden. *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (citing *United States v. Horton*, 847 F.2d 313, 316 (6th Cir. 1988)). A court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). The court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. Habeas relief is not warranted merely because defendants present antagonistic defenses. *Stanford*, 266 F.3d at 458. "Mutually antagonistic defenses are not prejudicial *per se.*" *Zafiro,* 506 U.S. at 538.

Petitioner does not argue that she was prejudiced by the joint trial because her defense strategy was antagonistic to that of her co-defendant/husband. Indeed, Petitioner and her co-defendant were aligned in a mutual strategy to present a case that Petitioner caused Dylan's death and her co-defendant participated only in the disposal of his remains.  Petitioner's fails to establish that she was denied the right to a fair trial because she was tried jointly with her husband. Instead, Petitioner argues that separate trials would have created a more difficult burden of proof for the state.

Petitioner has not identified a particular right she was denied because she tried jointly with her husband. She also has not articulated how the joint trial, under the circumstances, prevented the jury from making a reliable determination about her guilt. Moreover, as the Court of Appeals discussed at length, Petitioner cannot establish prejudice because the state would have been able to establish overwhelming evidence of guilt at separate trials, even if both defendants elected not to testify. The Court of Appeals' dismissal of Petitioner's ineffective assistance of counsel claim

27

for failure to file a motion to sever was neither contrary to nor an unreasonable application of *Strickland*.

### D. Failure to Adequately Prepare Petitioner for Cross-Examination

Next, Petitioner contends that her counsel was ineffective because he failed to adequately prepare her for cross-examination. Specifically, Petitioner alleges, "…anything less than a full account of the child's injuries would destroy any remote chance that the strategy had to save [Petitioner's] husband. Despite this, somehow trial counsel allowed [Petitioner] to take the stand and have no concept of how to account for the injuries he claimed she caused." (ECF No. 1-1 at PageID# 74). The Court of Appeals concluded that counsel was not ineffective because on cross-examination, Petitioner was at times uncooperative, but she ultimately admitted to causing Dylan's death and "the overwhelming evidence in the case at bar that far outweighs any possible mistake that counsel committed…" (ECF No. 9 at PageID# 262).

On direct examination, Petitioner testified that she alone caused Dylan's death, but it was not intentional. (ECF No. 11-2 at PageID# 1717, 1721). She also testified that her husband was not involved in Dylan's death and was unaware of Dylan's injuries. (*Id.*). During cross-examination, Petitioner failed to directly answer some of the prosecutor's questions, instead providing responses, "I have to live with this for the rest of my life," "You have devoured my family," and "I'm done talking to you." (*Id.* at PageID# 1722-1723). After the trial court recessed for Petitioner's counsel to instruct her to answer the prosecutor's questions (*id.* at PageID# 1724-1725), Petitioner testified that she did not recall Dylan's injuries because of her drug use. (*Id.* at PageID# 1726).

The Court of Appeals determined that Petitioner could not establish that she was prejudiced by her counsel's alleged deficient performance due to the overwhelming evidence of her guilt. The

Court cannot say that this conclusion is an unreasonable application of the facts to *Strickland*. Considering the evidence of Petitioner's guilt, as well as Petitioner's strategy to admit her guilt, she cannot demonstrate that a better performance on cross-examination would have altered the outcome of her trial.

### E. Failure to Advise Petitioner to Plead Guilty

Next, Petitioner contends that her counsel was ineffective for failing to advise her to plead guilty instead of proceeding to trial. The Court of Appeals dismissed the claim, concluding that under the "unique circumstances" of Petitioner's decision to concede guilt, there would have been no "practical difference" in the result if she had pleaded guilty. (ECF No. 9 at PageID# 264).

In the affidavit attached to her habeas corpus petition, Petitioner attests that the prosecution never offered her a plea deal:

> Before trial [] my husband and codefendant was [sic] offered two separate plea agreements by the prosecution. First being fifteen to life and second being fifteen, flat, in which he denied both. My defense counsel, Robert Stratton, never suggested a plea agreement for myself and informed me there was no offer from the prosecution.

(ECF No. 1-2). The record reflects that the trial court inquired about any plea offers at a December 18, 2019, pretrial conference, and the parties confirmed that no offers were made on either side. (ECF No. 11-1 at PageID# 685-686).

In *Lafler v. Cooper*, 566 U.S. 156 (2012), the Supreme Court described the appropriate prejudice analysis where counsel advises rejection of a plea offer:

> In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or

> sentence, or both, under the offer's terms would have been less
> severe than under the judgment and sentence that in fact were
> imposed.

*Id*. at 164. "[D]efendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *See Missouri v. Frye*, 566 U.S. 134, 147–49 (2012).

Petitioner cannot prevail on her claim for ineffective assistance of counsel because the state never offered a plea deal. To the extent Petitioner is arguing that she should have pled guilty to the indictment without a deal from the state, she offers no proof that a guilty plea would have led to a more favorable result. Petitioner made an unorthodox, but informed decision to admit her guilt before the jury. A guilty plea without a deal from the state, as noted by the Court of Appeals, would have had no practical effect on the outcome of her trial. Because Petitioner cannot establish the prejudice prong of the *Strickland* analysis, the Court of Appeals dismissal of Petitioner's ineffective assistance of counsel claim for deficient advice on a guilty plea was not an unreasonable application of federal law.

## F. Failure to Adequately Cross-Examine the State's Key Witness

Petitioner contends that her counsel was also ineffective because he inadequately cross-examined Dr. Susan Brown, the forensic pathologist who conducted the autopsy on Dylan. Petitioner argues that her counsel failed to challenge Dr. Brown's findings or opinions or present "alternate causes of injury to the child." (ECF No. 1-1 at PageID# 84). The Court of Appeals concluded that trial counsel's performance was not deficient:

> Pursuant to [Petitioner's] wishes, the defense strategy included [Petitioner's] decision to admit that she caused Dylan's death, while her co-defendant husband would admit that he concealed Dylan's body. In hindsight, although this course of action may appear to be somewhat ill-advised, both [Petitioner's] counsel and co-defendant's counsel executed the precise strategy that their clients sought to advance.

(ECF No. 9 at PageID# 266).

The record reflects that Petitioner's counsel briefly cross-examining Dr. Brown and did not challenge any of her testimony regarding the autopsy findings. (ECF No. 11-2 at PageID# 1550-1552). Keeping with the overarching theme of its opinion, the Court of Appeals determined that counsel's cross-examination was entirely consistent with the trial strategy Petitioner chose to pursue. Petitioner has also failed to elucidate precisely how her counsel could have challenged Dr. Brown's testimony in such a way that it would have overcome the strength of the evidence against her.

Counsel did not violate Petitioner's right to effective representation by yielding to her decision to not to challenge her guilt her at trial. This applies to the way counsel approached the cross-examination of Dr. Brown. Petitioner's claim regarding the cross-examination of Dr. Brown should be dismissed because the Court cannot say that the Court of Appeals' dismissal is an unreasonable application of the facts to *Strickland*.

### G.  Failure to Present Mitigating Evidence at Sentencing

Finally, Petitioner contends that her counsel was ineffective for failing to present any mitigating evidence during her sentencing. Petitioner's counsel made the following argument at sentencing:

> Yes, Your Honor. This has been a difficult matter for this entire community. It's--it's been shared with a lot of people. Jessica took responsibility, and I just ask the Court to consider that in sentencing.

(ECF No. 11-2 at PageID# 1808-1809). When pronouncing the sentence of life plus one hundred thirty-two years, the trial court, explained its reasons:

> As to the Defendant, Jessica Groves, as to those factors in 2929.12, I'll likewise find that she had--the injury was exacerbated by the victim's physical condition and age, that the victim suffered serious physical harm as a result of the crime, that the offenders relationship with the victim facilitated the offense, and that this is an offense where it was committed--or she committed this crime on her child as the

31

parent, custodian, or person en loco parentis. I'm going to further find that her--that she has shown a parent of alcohol or drug use related to this offense and does not acknowledge or refuse treatment. I'm also going to find despite her allocution here today that through these proceedings she's shown no genuine--genuine remorse. I will find that she has no prior criminal convictions.

(*Id.* at PageID# 1812-1813).

In her federal habeas petition, Petitioner does not offer what mitigation evidence was available that her counsel should have presented. In her direct appeal, Petitioner argued that her counsel should have presented evidence of the "possibility of post-partem depression." (ECF No. 9 at PageID# 174, 267). The Court of Appeals concluded that Petitioner's competency evaluation materials informed trial counsel's decision on the presentation of mitigation evidence at sentencing, particularly evidence that Petitioner had no symptoms of a severe mental illness and proof she was exaggerating her psychiatric difficulties. (ECF No. 9 at PageID # 266-270).

Petitioner cannot prevail on her ineffective assistance of counsel claim because she cannot demonstrate prejudice. First, she fails to present the Court with any evidence that her counsel should have offered to the trial court that would have changed the outcome of her sentencing. On direct appeal, she argued that her counsel should have offered evidence that she could have had post-partum depression, but the Court defers to the Court of Appeals' conclusion that trial counsel made a strategy decision not to offer that evidence based on the competency evaluation materials.[5] Moreover, the record reflects that the trial court's sentence was based on the vulnerability of the victim, the nature of the offense, and Petitioner's lack of genuine remorse. For these reasons, the Court of Appeals rejection of Petitioner's ineffective assistance of counsel at sentencing claim is neither contrary to nor an unreasonable application of federal law.

---

[5]     Ohio Rev. Code Ann. § 2929.12(4) permits the sentencing court to consider… "substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense." It appears unlikely that argument at the sentencing hearing regarding a possible diagnosis would have met this standard.

**VI.    CONCLUSION**

Petitioner's ineffective assistance of counsel claims are without merit. It is therefore **RECOMMENDED** that the habeas petition be **DENIED,** and this action be **DISMISSED WITH PREJUDICE.**

For the foregoing reasons, the Undersigned **RECOMMENDS:**

1.  Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF Nos. 1, 1-1) be **DENIED** with prejudice.

2.  A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** Petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

**PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO RECOMMENDED**.

September 3, 2024              *s/ Elizabeth A. Preston Deavers*
                              Elizabeth A. Preston Deavers
                              UNITED STATES MAGISTRATE JUDGE